UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

THOMAS C. FIUMANO,

Plaintiff,

- versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

Defendant.

MEMORANDUM
AND ORDER

13-CV-2848 (JG)

APPEARANCES:

LAW OFFICE OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.
60 East 42nd Street, Suite 520
New York, NY 10165
By:     John Moran
        *Attorney for Plaintiff*

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
By:     Ameet B. Kabrawala
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

Thomas Carl Fiumano seeks review, pursuant to 42 U.S.C. § 405(g), of the

Commissioner of Social Security's denial of his application for Social Security Disability

("SSD") benefits. The parties have cross-moved for judgment on the pleadings. The

Commissioner seeks a judgment upholding her determination and Fiumano seeks a judgment

awarding him benefits or, alternatively, a remand to the Commissioner for further proceedings. I

heard oral argument on October 25, 2013. For the reasons stated below, the Commissioner's

motion is granted and Fiumano's cross-motion is denied.

BACKGROUND

A. *Facts and Procedural History*

   Fiumano was born in 1968. R. 165.[1]  He has a high school education, R. 65, and has lived with his parents for his entire life.  R. 71.  When he was seven years old, he was hit by a car and was in a coma for six weeks.  R. 246.  He was placed in special education classes when he returned to school.  R. 246.  In 2004, Fiumano was diagnosed with intermittent explosive disorder.[2]  R. 242-43.  Fiumano filed an application for SSD benefits on January 14, 2011, claiming disability since January 31, 2006.  R. 165.  He was last insured for purposes of such benefits on June 30, 2007. R. 36.  In a Function Report, completed by Fiumano with assistance from his father on January 24, 2011, he stated he could sometimes follow written and spoken instructions, but has problems with authority and being told what to do.  R. 234.  He reported having trouble paying attention because he loses interest or forgets things.  R. 234.  He stated he has problems getting along with others and that he does not like change.  R. 232.

   The Commissioner denied the application on February 9, 2011.  R. 93.  Fiumano requested a hearing before an Administrative Law Judge ("ALJ") on April 4, 2011, R. 105-06, and a hearing was held before ALJ Michael J. Stacchini on March 7, 2012.  R. 47.  Fiumano, who was represented by counsel, testified at the hearing, R. 53-71, as did his father, Patrick Fiumano, R. 71-80, and vocational expert Edna Clark.  R. 80-87.  On March 22, 2012, the ALJ found that Fiumano was not disabled within the meaning of the Social Security Act.  He found that Fiumano retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but was limited to work that would allow him to be off task 5% of the day, in

---

[1]   Citations in the form "R.__" are to the pages of the administrative record.
[2]   Intermittent explosive disorder is a behavioral disorder characterized by repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which the individual reacts grossly out of proportion to the situation.  *Intermittent Explosive Disorder: Definition*, MAYO CLINIC (Oct. 25, 2013), http://www.mayoclinic.com/health/intermittent-explosive-disorder/DS00730.

addition to regularly scheduled breaks, and that would allow one absence per month.  R. 38.

Additionally, the ALJ found that Fiumano was "limited to work involving simple, routine and

repetitive tasks" and could perform a job with "only occasional decision-making, only occasional

changes in the work setting, and only occasional interaction with the public and coworkers, with

no tandem tasks."  R. 38.  The ALJ concluded that Fiumano was capable of performing his past

relevant work as a kitchen helper and bagger, as well as other jobs existing in significant

numbers in the national economy.  R. 40-42.  The Appeals Council denied Fiumano's request for

review on March 25, 2013, R. 1-7, rendering the ALJ's adverse decision the final decision of the

Commissioner.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

Fiumano brought this action on May 14, 2013, alleging that the ALJ and the

Appeals Council committed various errors that require reversal of the Commissioner's decision,

either for a direct award of benefits by this Court or a remand for a new hearing.  As mentioned

above, both sides have moved for judgment on the pleadings.

B.  *Thomas Fiumano's Statements and Testimony*

Fiumano testified that he last worked as a dishwasher at Wagner College in Staten

Island for a year in 2005 and 2006.  R. 225.  That job consisted of scraping leftover food off of

plates, stacking the plates, and then handing the stacks of plates to the dishwasher.  R. 59-60.  He

was fired from that job due to a verbal altercation he had with his coworkers.  R. 60.  Previously,

Fiumano had worked part time as a security guard and a laborer in 2001 and 2002.  R. 225.  He

testified at the hearing that he quit his job as a security guard because he felt he was not being

paid enough.  R. 63.  Fiumano further testified that he had worked from 1994 to 2000 at a

Shoprite supermarket.  R. 62.  His work at Shoprite initially consisted of washing floors, but then

3

he collected shopping carts outside and eventually worked in the produce section.  R. 61.  He was fired because of issues with his coworkers.  R. 62.

Fiumano testified that he does not have a driver's license but takes public transportation on his own.  R. 54.  Once he became unemployed, Fiumano started going to a diner every day for coffee, rotating between five or six different diners.  R. 54.  He has not had any problems getting along with people at the diners.  R. 55.  He goes to a park once or twice a week and also sees friends two to three times a week. R. 54, 65.  Fiumano testified that he had attended a ninjutsu martial arts class two to three times a week for ten years, but stopped attending in 2009 or 2010 because he "was insulted too much."  R. 57.  By the time he stopped attending classes he had progressed many levels and had almost received his black belt.  R. 57.  Fiumano testified that his parents support him financially, but that he helps out around the house, carrying the laundry downstairs or going to the store with a list.  R. 70.  He also cuts the grass and shovels snow under supervision.  R. 230.  Fiumano reads daily for approximately half an hour to forty-five minutes, R. 64, and has meditated daily for the last five years to help control his anger.  R. 58.  Fiumano stated that he has never been arrested for a violent crime, but he was arrested once for jumping a turnstile.  R. 55.

Fiumano testified at the hearing that he is unable to work because he "get[s] angry too quickly."  R. 63.  He stated that he worries he would get angry with someone at work and do something that would get him in trouble or arrested.  R. 63.  When asked what would cause him to get angry, Fiumano replied "[l]et's say they talk down to me and belittle me.  That's when I would get angry."  R. 66.  He stated that no one had made him angry in a long time, in part because he has not been working for several years.  R. 67.   In an appeal report completed after

he requested a hearing, Fiumano stated that his condition had been progressively worsening since March 2011.  R. 208.

Fiumano testified that he was no longer receiving psychotherapy because he could not afford it but continued to see his therapist, Dr. Matthew Garcia, once a month.  R. 68.  He stated he has been taking the same daily medication, thioridazine, for approximately the last ten years.  R. 59.

C.  *Patrick Fiumano's Testimony*

Plaintiff's father, Patrick Fiumano, also testified at the hearing.  R. 71-78.  He stated that he believes his son is incapable of working because he is unable to multi-task.  R. 73. He further testified that his son's issues with anger management, lack of concentration, and bouts of depression also render him unable to hold a job.  R. 74.  He explained that although his son had worked at Shoprite for six years, he had almost been fired three or four times and it was only because of Patrick Fiumano's connections with people who worked at Shoprite that Thomas Fiumano was permitted to stay at that job as long as he did.  R. 73.  Patrick Fiumano also testified that his son's condition had "gotten a little bit worse" since 2006, after he stopped attending weekly psychologist sessions due to the cost.  R. 77.

D.  *Medical Evidence*

On October 30, 2004, Fiumano was diagnosed with intermittent explosive disorder by Elpidio Marlon Garcia, M.D., a psychiatrist, at the Community Treatment Center of the Richmond University Medical Center.  R. 242-43.  Shortly thereafter, Fiumano began attending regular weekly therapy sessions at that facility with Patricia Rauen, M.S., C.R.C.  R. 250-55.  Those sessions, which began in November 2004, lasted through December 2009.

On February 5, 2007, Fiumano underwent a psychological assessment by Rauen. R. 246. She noted that Fiumano "was hit by a car at age seven and was in a coma for six weeks" and that "when he returned to school, he was placed in special education classes." R. 246. Her assessment further noted that Fiumano claimed his parents were not emotionally supportive of him and that he received support from his martial arts instructor and in therapy. R. 246. Rauen recommended continued individual therapy and a medical evaluation. R. 247.

Fiumano met with Dr. Garcia intermittently from December 2004 through November 2010 for medication management. R. 250-55. Garcia completed a treatment plan update for Fiumano on February 19, 2007. R. 315-16. He confirmed the earlier diagnosis of intermittent explosive disorder. Garcia found that Fiumano was "stable" but demonstrated "poor frustration tolerance which can result in problems with interpersonal relationships." R. 315. He assessed a Global Assessment of Functioning ("GAF") score of 52.[3] R. 315. Garcia made similar assessments at treatment plan updates conducted on May 19, 2007, August 10, 2007, November 19, 2007, and August 19, 2009. R. 285, 309-14. During the August 10, 2007, treatment plan update, Fiumano's first visit following the date he was last insured, Fiumano reported "he was in good control during this period" and he "denied any problems with anger management." R. 311. At the November 19, 2007, update, Fiumano told Garcia that there had been "several occurrences in the past three months in which he became angry, and was able to deal with his anger appropriately." R. 309. In each of these treatment plan updates, Garcia

---

[3] Global Assessment of Functioning is a numeric scale ranging from 0 through 100 used by mental health professionals to assess the functioning of adults. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. text rev. 2000) ("DSM–IV"). A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* (emphasis in original).

affirmed that Fiumano suffered from intermittent explosive disorder and assigned him a GAF score of 52.  R.  285, 209-14.

At another treatment plan update, conducted on February 17, 2010, Dr. Garcia made similar observations regarding Fiumano's condition, but increased his GAF score to 60.  R. 284.  As in the previous treatment plan updates, Garcia noted that Fiumano reported no aggressive behavior over the preceding three months.  R. 284.  On November 6, 2010, Fiumano visited Garcia for another treatment plan update, in which Garcia determined that Fiumano's GAF score was 63.[4]  R. 283.

On November 29, 2010, Fiumano returned to Dr. Garcia.  Fiumano reported that he was doing "ok" and had no aggression in the past month, and he asked Garcia to write a letter to his lawyer.  R. 260-261.  In a letter written that same day, Garcia reported that Fiumano was diagnosed with intermittent explosive disorder and was prescribed thioridazine to be taken daily. R.  241.  He stated that Fiumano had "difficulty relating with people due to anger and poor impulse control," that he had "trouble concentrating and focusing" and, as such, was "unable to work at this time."  R. 241.

Dr. Garcia completed a Psychiatric/Psychological Impairment Questionnaire on September 26, 2011.  R. 290.  He once again diagnosed Fiumano with intermittent explosive disorder, rated his GAF score at 60, and listed his prognosis as "fair."  R. 290.  Garcia supported this diagnosis with "clinical findings" that Fiumano exhibited "sleep disturbance," "emotional lability," "delusions or hallucinations, ideas of people watching," "psychomotor agitation or retardation," "paranoia or inappropriate suspiciousness," "hostility or irritability," "poor

---

[4]        A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV 27 (emphasis in original).

frustration tolerance," and "poor impulse control."  R. 291.  Garcia listed Fiumano's primary

symptoms as "mood lability, paranoia, and impulsive behavior."  R. 292.  In assessing whether

Fiumano was able to work, Garcia opined that Fiumano was "moderately limited"[5] with respect

to his ability to: remember locations and work-like procedures; remember and understand

instructions; make simple work-related decisions; ask simple questions or request assistance;

accept instructions and respond appropriately to criticism from supervisors; respond

appropriately to changes in the work setting; be aware of normal hazards and take appropriate

precautions; and travel to unfamiliar places or use public transportation.  R. 293-95.

    Dr. Garcia determined Fiumano was "markedly limited"[6] in his ability to: carry

out simple as well as detailed instructions; maintain concentration for extended periods; follow a

schedule and maintain regular attendance, and be punctual; sustain ordinary routine without

supervision; work in coordination with or proximity to others without being distracted by them;

complete a normal workweek without interruptions from psychologically-based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods; interact

with the general public; get along with co-workers or peers without distracting them or

exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; and set realistic goals or make plans independently.  R.

293-95.  Garcia opined that Fiumano was "incapable of even 'low stress,'" R. 296, and estimated

that he would be absent from work more than three times a month due to his condition.  R. 297.

Garcia asserted that these symptoms and limitations had begun in 1994, R. 297, but that Fiumano

had never required hospitalization for his disorder.  R. 292.

---

[5]  "Moderately limited" is defined on the form as "significantly affects but does not totally preclude the individual's ability to perform the activity."  R. 292.
[6]  "Markedly limited" is defined on the form as "effectively precludes the individual from performing the activity in a meaningful manner."  R. 292.

E.  *Vocational Expert Testimony*

Edna Clark, a vocational expert, testified at the March 2012 hearing.  R. 79-88. She identified Fiumano's past work as a dishwasher and a bagger as unskilled medium-level work, both with a Specific Vocational Preparation ("SVP") of 2.[7]  R. 81.  The ALJ asked Clark to assume "a person of the claimant's age, education, and work experience" with no exertional limitations, who is "permitted to be off task for 5 percent of the day in addition to regularly scheduled breaks."  R. 81.  The hypothetical individual "may take one absence a month" and "would be limited to work that is simple, routine, and repetitive tasks; may have only occasional decision makes [sic], only occasional changes in the work setting," and only "occasional interaction with the public [and] coworkers."  R. 81-82.  Clark opined that such an individual would be able to do Fiumano's past work as a bagger at Shoprite.  R. 82.  She also stated that such a hypothetical person could perform other unskilled medium-level work as a hand packer, a cleaner, a final assembler, and a light hand trimmer.  R. 83-84.  She stated that these positions exist in relatively large numbers in both the regional[8] and national economies.  R. 83-84.

The ALJ then asked Clark to assume an individual with the same limitations who would be off-task twenty percent of the day and would have at least two unscheduled absences per month.  R. 84.  Clark replied that such an individual would not be able to find a job.  R. 84. Fiumano's counsel asked Clark to assume the original hypothetical person was incapable of any interaction with coworkers.  R. 86-87.  Clark asserted that there would not be work available for such an individual.  R. 87.

---

[7]      An SVP refers to the amount of time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES app. C (4th ed. 1991).  The SVP ranges from 1 ("short demonstration only") to 9 ("over 10 years").  A SVP of 2 corresponds to anything beyond a short demonstration up to and including one month.  *Id.*
[8]      The ALJ defined the regional economy as consisting of "[t]he New York City Metropolitan area, approximately a 50-mile radius from Manhattan."  R. 80.

9

DISCUSSION

A.  *The Legal Standard*

In order to receive disability benefits under the Social Security Act, a claimant must have been disabled during an insured period.  42 U.S.C. § 423(c); *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989).  To be found disabled, Fiumano must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  § 423(d)(1)(A).  A claimant may be found disabled only if his impairment or impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  § 423(d)(2)(A).

The Social Security Administration's regulations prescribe a sequential five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

10

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation and alterations omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process).  The claimant bears the burden of proof in the first four steps, the Commissioner in the last.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The first inquiry requires the court to determine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).  The second inquiry requires the court to decide if the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also id.* ("Substantial evidence is more than a mere scintilla.") (internal quotation omitted).

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).  A remand is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, [] to have correctly applied the . . . regulations," *Manago v. Barnhart*, 321 F.Supp.2d 559, 568 (E.D.N.Y. 2004), or "[w]here there are gaps in the administrative

record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

B.  *The ALJ's Rejection of Fiumano's Disability Claim*

At the outset, the ALJ determined that Fiumano was last insured for purposes of disability benefits on June 30, 2007.  R. 36.  The ALJ then followed the five-step analysis described above to determine whether Fiumano was eligible to receive disability benefits.  At step one, the ALJ found that Fiumano had not engaged in substantial gainful activity since his alleged disability onset date, January 31, 2006.  R. 36.  At step two, the ALJ determined that Fiumano suffers from intermittent explosive disorder, which constitutes a severe impairment.  R. 36.

At the third step of the analysis, the ALJ found that Fiumano's impairment did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 36 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  Specifically, the ALJ analyzed Fiumano's impairment under Listing 12.08 (Personality Disorders) and determined that the paragraph "B" criteria were not satisfied.  He found that Fiumano's impairment did not qualify as a "personality disorder" because it did not result in at least two of the following limitations on Fiumano's abilities, as required by § 12.08(B): "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  R. 37.  He noted that "[a] marked limitation means more than moderate but less than extreme."  R. 37.

The ALJ found that Fiumano suffers from only a mild restriction in the activities of daily living.  R. 37.  He noted that although Fiumano does not cook, has no driver's license,

and shops only with difficulty, he regularly takes public transportation, visits various diners, and goes for daily walks.  R. 37.  The ALJ concluded that while Fiumano's "mental impairment caused difficulties in this area," such difficulties do not rise to a moderate degree.  R. 37.

The ALJ next found that Fiumano suffers from moderate difficulties in social functioning.  R. 37.  The ALJ referenced Fiumano's consistent problems interacting with his coworkers and bosses, and the fact that Fiumano "has lost every job he had for this reason."  R. 37.  On the other hand, the ALJ noted that Fiumano testified to practicing martial arts consistently for a ten-year period, meditating daily, and using coping skills obtained through therapy to deal with his anger management issues.  R. 37.  Furthermore, the ALJ again cited Fiumano's frequent visits to diners, ability to use public transportation without incident, and his regular visits with friends as facts demonstrating that Fiumano's difficulties in social functioning do not rise to a marked degree.  R. 37.

Regarding concentration, persistence or pace, the ALJ again found that Fiumano suffered from moderate, but not marked, difficulties.  R. 37.  The ALJ referenced Fiumano's testimony that he has problems with his short-term memory and ability to pay attention.  R. 37.  He also considered Fiumano's father's testimony that his son had a lack of concentration, was unable to multi-task, and often bought the wrong items from the store, even when he had been provided with a list.  R. 37.  However, again citing Fiumano's significant and regimented martial arts practice, as well as his daily reading and meditation practice, the ALJ found that his difficulties in this area are not marked.  R.37.  Finally, the ALJ determined that Fiumano "had experienced no episodes of decompensation, which have been of extended duration."  R. 38.

The ALJ then moved to the fourth step of the analysis, where he determined that Fiumano has the RFC

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: the claimant is limited to work
> allowing him to be off task 5% of the day, in addition to regularly
> scheduled breaks; and allowing 1 absence a month.  In addition, the
> claimant is limited to work involving simple, routine and repetitive tasks.
> Further, he is limited to only occasional decision-making, only occasional
> changes in the work setting, and only occasional interaction with the
> public and coworkers, with no tandem tasks.

R. 38.

In reaching this determination, the ALJ considered Fiumano's testimony that he
could not work because he "gets angry too quickly."  R. 39.  He found that "the claimant's
medically determinable impairment could reasonably be expected to cause the alleged
symptoms," but he ultimately concluded that Fiumano's statements were "not credible to the
extent they are inconsistent with the above residual functional capacity assessment."  R. 39.  The
ALJ considered Fiumano's testimony that he is able to walk away from situations when he gets
angry, as well as his long practice of martial arts and meditation as tending to show that
Fiumano's symptoms do not have the severe limiting effects alleged.  R. 39.  He similarly cited
the facts that Fiumano held a job at Shopright for over six years and helps around the house and
goes to the store on his own as evidence of Fiumano's capability to perform his past relevant
work as a bagger, despite Fiumano's testimony to the contrary.  R. 39.  The ALJ also found
Fiumano's father's testimony "not credible to the extent it is inconsistent with the above [RFC]"
for the same reasons.  R. 39.

Regarding the medical evidence, the ALJ agreed that Fiumano suffers from
intermittent explosive disorder, but found that the medical evidence "does not support limitations
inconsistent with the above [RFC] prior to his date last insured of June 30, 2007."  R. 40.  The
ALJ noted that through the date he was last insured, Fiumano's treating physician, Dr. Garcia,
"described the claimant as stable."  R. 40.  The ALJ disagreed with Garcia's September 2011

14

assessment, which concluded that Fiumano was incapable of handling even "low stress" and would likely be absent from work more than three times per month due to his impairment.  In support of his finding, the ALJ once again cited the evidence of Fiumano's six years of employment with Shopright, his regular attendance at martial arts classes for ten years, and his ability to regularly attend medical appointments.  R. 40.  In light of the evidence of Fiumano's activities and capabilities, as well as Garcia's own treatment notes from just before and after the date last insured, the ALJ found Garcia's later assessment that Fiumano was unable to work carried "little weight."  R. 39.

The ALJ went on to determine, based on Fiumano's RFC and the testimony of the vocational expert, that Fiumano was capable of performing his past relevant work as a bagger as he actually performed it.  R. 41.  Despite that finding, the ALJ continued to step five of the analysis, finding that based on his RFC, additional jobs exist in significant numbers in the national and regional economies that Fiumano could perform.  R. 41.  Accordingly, the ALJ concluded that Fiumano "was not under a disability, as defined in the Social Security Act, at any time from January 31, 2006, the alleged onset date, through June 30, 2007, the date last insured." R. 42 (citing 20 C.F.R. 404.1520(f)).

C.   *Analysis of the ALJ's Decision*

Fiumano alleges that the ALJ's decision is not supported by substantial evidence in several respects.

1.   *The ALJ's RFC Determination*

An RFC determination describes "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, an ALJ must take into consideration his physical and mental impairments, symptoms (including pain), and "all of

the relevant medical and other evidence." §§ 404.1545(a)(1)-(2).  Regarding mental

impairments, an ALJ must take into consideration limitations on a claimant's "understanding,

remembering, and carrying out instructions, and in responding appropriately to supervision, co-

workers, and work pressures in a work setting . . . ." § 404.1545(c).

Fiumano claims that the ALJ's RFC finding lacks substantial support in the

record.  Pl. Br. 11.  This claim is unavailing.  As required in determining Fiumano's RFC, the

ALJ first determined whether Fiumano's impairment could reasonably be expected to cause the

symptoms alleged.  R. 39.  Next, he evaluated the "intensity, persistence, and limiting effects" of

Fiumano's symptoms "to determine the extent to which they limit the claimant's functioning."

R. 38.  The ALJ noted the testimony from Fiumano and his father that Fiumano's symptoms

limited his functioning to such an extent that he was unable to work.  R. 39.  However, he

concluded that this testimony "is not credible to the extent that it is inconsistent with the above

residual functional capacity" in light of the evidence of Fiumano's long-standing martial arts

practice, his daily meditation and reading, prior work experience, ability to help around the

house, and regular social interactions.  R. 39.

The ALJ was required to analyze the credibility of the Fiumanos' testimony by

considering if the claimant's impairments could "reasonably be expected to produce the

symptoms" to which they testified, and by evaluating the extent to which these symptoms were

"consistent" with the rest of the record.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir.2010) (per

curiam) (citing 20 C.F.R. § 404.1529); *Yu v. Astrue*, 12-CV-00813, 2013 WL 4046255, at *13

(E.D.N.Y. Aug. 8, 2013).  In undertaking the required credibility analysis, the ALJ properly

considered Fiumano's daily activities and other evidence in the record in weighing the credibility

of the testimony.[9]  An ALJ is not required to accept a claimant's testimony regarding the severity

and persistence of his symptoms as true, but rather can evaluate the credibility of a claimant to

arrive at an independent judgment based on the medical findings and other evidence.  *See Mimms*

*v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).

       The ALJ also considered Dr. Garcia's September 2011 assessment, but

determined that Garcia's opinions should be "afforded little weight."  R. 40.  Fiumano asserts

that the ALJ failed to follow the treating physician rule by not giving Garcia's opinions

controlling weight.  Memorandum of Law in Support of Plaintiff's Motion for Judgment on the

Pleadings ("Pl. Br.") 7.  "According to this rule, the opinion of a claimant's treating physician as

to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-

supported by medically acceptable clinical and laboratory diagnostics techniques and is not

inconsistent with the other substantial evidence in the case record.'"  *Burgess v. Astrue*, 537 F.3d

117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).  "In order to override the opinion

of the treating physician . . . the ALJ must explicitly consider, *inter alia*: (1) the frequen[cy],

length, nature, and extent of treatment; (2) the amount of medical evidence supporting the

opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether

the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*,

537 F.3d at 129).

       Here, the ALJ stated that he accorded Garcia's September 2011 assessment of

Fiumano "little weight" because "his opinion is not supported by the evidence of record."  R. 40.

---

[9]     While the ALJ stated that he found the testimony of Fiumano and his father is not credible "to the
extent that it is inconsistent with the above residual functional capacity," he went on to compare the inconsistencies
not with the RFC, but with the other evidence in the record.  *See* R. 38-40.  Thus, although the ALJ used language
that I found unacceptable in *Yu v. Astrue*, 12-CV-00813, 2013 WL 4046255 (E.D.N.Y. Aug. 8, 2013), the ALJ here
did not actually employ an improper credibility determination in violation of "the dictates of the Social Security
regulations."  *Id.* at *13 (internal quotation omitted).  The ALJ in this case stated elsewhere in his decision that he
would make the credibility determinations based on the "entire case record" and the evidence here supports those
credibility determinations.  *See id.*

As the ALJ noted, Garcia's assessment in September of 2011 that Fiumano's impairment had been severe enough to prevent Fiumano from being able to work since 1994 was plainly incorrect.  Between 1994 and June 2007, when Fiumano was last insured, Fiumano held a job at Shopright for over six years, R. 40, 61-62, 225, worked as a security guard and laborer for several months, R. 225, and worked as a dishwasher for a year.  R. 59-60.  The ALJ further stated that Garcia's own treatment notes in the years prior to his September 2011 assessment of Fiumano do not support the conclusion that Fiumano had been incapable of holding a job for that entire period.  R. 40; *see* R. 311-12 (Garcia reporting in August 2007, shortly after the relevant period, that Fiumano was "in good control and denied any problems with anger management" since the last visit).  The ALJ also properly relied on Fiumano's routines of reading, visiting parks and diners, use of public transportation, and ability to run errands for his parents.

I conclude that the ALJ's decision not to accord Dr. Garcia's September 2011 opinion controlling or even significant weight was permissible because the opinion was contradicted by non-medical and medical evidence in the record.  *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given.").  In sum, I find that substantial evidence existed to support the ALJ's determination of Fiumano's RFC.  *See Halloran*, 362 F.3d at 31 ("[A court] does not determine *de novo* whether [a claimant] is disabled; we ascertain whether the decision was supported by substantial evidence.") (internal quotation and citation omitted).

  2. *The New Evidence Submitted to the Appeals Council*

Dr. Azariah Eshkenazi conducted a psychiatric evaluation of Fiumano on June 4, 2012, which was submitted by Fiumano to the Appeals Council in his application for review.  R. 13-15.  Eshkenazi conducted a personal evaluation and examined Fiumano's medical records.  R. 13.  Eshkenazi noted that there was no evidence of psychosis, but that Fiumano's judgment and insight is "fair, at best" and that his "affect is labile."  R. 14.  He stated that Fiumano "becomes very hostile and angry" and that "[h]is mood is that of anxiety and depression."  R. 14.  He diagnosed Fiumano with "Personality Disorder – Severe" as well as "Explosive Personality Disorder," R. 15, and determined that Fiumano "certainly cannot interact with other people" and is "not able to be gainfully employed."  R. 15.  Eshkenazi also completed a Psychiatric/Psychological Impairment questionnaire, in which he asserted, *inter alia*, that Fiumano had a GAF score of 45-50 and that his prognosis was "poor."[10]  R. 17-24.  The Appeals Council considered the evaluation, but determined it was not relevant because it related to the time period after Fiumano was last insured.  R. 2.

If new evidence submitted to the Appeals Council relates to a period before the ALJ's decision, "the Appeals Council shall evaluate the entire record including the new and material evidence submitted."  *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  New evidence submitted to the Appeals Council "becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."  *Id.* at 45.  Here, however, the Appeals Council was correct in determining that Dr. Eshkenazi's evaluation does not relate to a period before the ALJ's decision, and therefore is irrelevant in this proceeding.  *See id.* at 44.  Eshkenazi stated that the purpose of his evaluation "was to ascertain whether or not Mr. Fiumano *is* able to be gainfully employed."  R. 13 (emphasis added).  He concludes his diagnosis

---

[10]     A GAF score of 41-50 signifies "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)."  DSM-IV 27 (emphasis in original).

similarly, by stating that "as a result of his Personality Disorder, Mr. Thomas Carl Fiumano *is*

not able to be gainfully employed.  He certainly cannot interact with other people."  R. 15

(emphasis added).  Eshkenazi's use of the present tense in these statements demonstrates that his

evaluation of Fiumano was based on his current condition and it sheds no light on whether he

was capable of working in June 2007, when Fiumano was last insured.[11]

CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the

pleadings is granted and Fiumano's cross-motion is denied.  The Clerk of the Court is

respectfully requested to enter judgment accordingly and close this case.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 4, 2013
Brooklyn, New York

---

[11]     Dr. Eshkenazi did note in his Psychiatric/Psychological Impairment Questionnaire that "in his best medical opinion" the symptoms and limitations exhibited by Fiumano had existed for up to 30 years.  R. 24. However, as discussed above, the focus of his report was clearly on Fiumano's current condition.  And even if Eshkenazi had explicitly stated that Fiumano has been unable to work for 30 years, such an opinion would suffer from the same problem as Dr. Garcia's September 2011 assessment: that period includes many years when Fiumano was, in fact, gainfully employed.  Accordingly, an opinion that Fiumano could not have held a job for the last 30 years would rightfully be accorded very little weight, and any error in not considering this evidence was harmless.